UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| JAMES PATTERSON and LISA M. COFFEY, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-881-LJM-WTL |
| | ) | |
| INDIANA NEWSPAPERS, INC., | ) | |
| an Indiana corporation, publisher of | ) | |
| *THE INDIANAPOLIS STAR*, owned by | ) | |
| GANNETT CO., INC., a foreign corporation, | ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Defendants', Indiana Newspapers, Inc., an Indiana corporation, publisher of *The Indianapolis Star*, owned by Gannett Co., Inc., a foreign corporation ("THE STAR"), motion for summary judgment (Docket No. 90).  Plaintiffs, James Patterson ("Patterson") and Lisa M. Coffey ("Coffey") (Patterson and Coffey collectively, "Plaintiffs") brought this lawsuit against THE STAR alleging violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*), and state law.  More specifically, Patterson claims that THE STAR (1) discriminated against him because of his religion, race, and age; (2) unlawfully retaliated against him for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"); and (3) negligently inflicted emotional distress.  Coffey claims that THE STAR (1) discriminated against her because of her religion; (2) constructively discharged her by creating and maintaining difficult working conditions; and (3) negligently inflicting emotional distress.  The summary judgment motion has been fully briefed and is now ripe for ruling.

For the reasons stated herein, THE STAR's motion for summary judgment is **GRANTED.**

# I.  PRELIMINARY EVIDENTIARY MATTERS

As a preliminary matter, the Court must address certain evidentiary concerns raised by the parties.  THE STAR contends that the Plaintiffs have submitted affidavits that directly contradict their deposition testimony.  It also challenges portions of affidavits from various former employees on the basis that they are based on inadmissible evidence.

With respect to the Plaintiffs' affidavits, the Court is concerned with two instances: Patterson's attempt to change his testimony on his workload under Swarens, and the Plaintiffs' new allegations of the health and emotional issues that they experienced as a result of their employment and separation from employment.  In both cases, the averments in the affidavits directly contradict Plaintiffs' deposition testimony.  It is well-settled that a party may not attempt to create a factual dispute by offering such evidence.  *See, e.g.*, *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623-24 (7th Cir. 2002).  Therefore, the Court will disregard the new and contradictory information contained in the Plaintiffs' affidavits.

With respect to the affidavits of former employees, the Court will not delve into the specifics of each affidavit.  It is enough to say that the Court also will not consider allegations in the affidavits of former employees that are based on hearsay or contain speculative or argumentative information.

The Court concludes that any additional objections that the parties have, such as the admissibility of newspaper and internet articles, emails from the Guild, and memorandum completed by the Equal Employment Opportunity Commission ("EEOC"), are unremarkable and do not warrant further consideration for the disposition of the instant motion for summary judgment.

## II.  <u>BACKGROUND</u>

Local Rule 56.1(b) requires a party opposing a motion for summary judgment to include a section specifically indicating any material facts in dispute and citing to admissible evidence that controverts the moving party's evidence.  Where a party has failed to comply with that provision, Local Rule 56.1(e) provides that the Court will accept the moving party's factual assertions, at least to the extent that there is not otherwise a showing that those assertions lack supportive evidence.

Here, Plaintiffs have failed to comply with the local rules by indicating which of THE STAR's assertions are disputed.  Instead, Plaintiffs statement of fact is largely argumentative.  Therefore, with the exception of additional facts offered by Plaintiffs or where the parties' arguments reveal that there is an obvious dispute, the Court assumes that THE STAR's statement of facts is undisputed and will accept them.  In doing so, the Court notes the following:

### A.  THE STAR AND ITS MANAGEMENT

THE STAR holds itself out as the leading newspaper in Indiana.  Zoibi Decl., ¶ 3.  Although it is not a religious-based publication, it does have some religious content.  Ryerson Dep. at 11; Neal Dep. at 95; Ryerson Decl., ¶ 4.  For example, the front-page "name plate" includes a Biblical verse, there is a weekly "Faith and Values" section highlighting current religious and ethical debates, and THE STAR consistently has editorials touching on topics that have religious overtones, such as same-sex mariage and prayer during state legislative services.  Ryerson Dep. at 33-34, 47; Ryerson Decl., ¶ 4.  THE STAR has also permitted Christian employees to conduct Bible study during their lunch breaks and Muslim employees to participate in Friday Jumu'ah prayer.  Zoibi Decl., ¶ 4; Coffey Dep. at  248; Patterson Dep. at 219-20; Swarens Decl., ¶ 25.

3

THE STAR is managed by three individuals. Barbara Henry ("Henry") has been the newspaper's President and Publisher since August 2000 and retains ultimate oversight of operations and financial performance. Henry Dep. at 9, 14, 21; Henry Decl., ¶ 3. Dennis Ryerson ("Ryerson"), has been the Editor and Vice President since March 2003 and is accountable for the performance of the Newsroom, the specific content of the news stories and editorials, and the Newsroom's staffing. Ryerson Dep. at 20-22, 34-35, 41-43; Ryerson Decl., ¶ 2. Below Henry and Ryerson is the Editorial Page Editor, who reports directly to Ryerson and retains direct responsibility for the content and format of the Editorial, Focus, and Op-Ed pages. Ryerson Dep. at 35-36; Ryerson Decl., ¶ 3; Swarens Decl., ¶ 2. From May 2000 until August 2003, the Editorial Page Editor was Andrea Neal ("Neal"). Neal Dep. at 6-7, 126; Neal Decl., ¶¶ 2, 11. Neal left THE STAR in August 2003 for a one-year sabbatical and then, at the conclusion of the sabbatical, officially resigned to begin teaching. Neal Dep. at 7, 83. Ryerson selected Tim Swarens ("Swarens") to replace Neal temporarily during Neal's sabbatical and made the selection permanent once Neal officially resigned. Coffey Dep. at 83-85; Patterson Dep. at 78-79, 123-24; Ryerson Decl., ¶ 3; Swarens Decl., ¶ 25.

Coffey and Patterson were Editorial Writers. They both reported to Neal and later to Swarens. Coffey Dep. at 82; Patterson Dep. at 44.

## B.  COFFEY'S EMPLOYMENT HISTORY AND SEPARATION

Coffey was hired in 1999 as a full-time Copy Editor. Coffey Dep. at 59; Ryerson Decl., ¶¶ 8-9. Coffey was initially assigned to the Night Copy Desk and then later worked on the Metro Desk. As a Copy Editor, Coffey was responsible for editing the news stories drafted by reporters. Coffey Dep. at 59, 71-72. Coffey told her supervisor that she enjoyed working on the Metro Desk and

admits that she enjoyed working with the other staff assigned to the Metro Desk.  Coffey Dep. at 74-76; Def.'s Ex. 17, p. 15.

In addition to working as a Copy Editor, Coffey served as the Administrative Assistant for the Pulliam Fellowship, an internship program for aspiring print journalists.  Coffey Dep. at 59; Ryerson Decl., ¶ 9.  In August 2001, Coffey complied that the combination of her responsibilities was overwhelming, and THE STAR agreed that she would work part-time as a Copy Editor for three days per week and complete her administrative assistant responsibilities during the remaining two days  per week.  Coffey Dep. at 61-62.

In September 2002, Coffey transferred from her part-time Copy Editor position to a part-time Editorial Writer position.  Coffey Dep. at 64.  As an Editorial Writer, Coffey was responsible for drafting editorials and columns, copy editing the editorial pages, completing various page design tasks, and assisting with special projects.  Coffey Dep. at 81-82, 85-86; Def.'s Ex. 17.  During the time as an Editorial Writer, Coffey maintained her responsibilities for the Pulliam Fellowship two days per week.  Coffey Dep. at 64.

In March 2003, Coffey decided to a write a series of columns describing the risks associated with anal intercourse.  Coffey Dep. at 111-13.  She believed that she had a moral responsibility to write the series.  *Id.* at p. 116.  Coffey wrote the first article from a public health and economics perspective rather than a religious perspective.  *Id.* at p. 293.  On or about July 23, 2003, after Coffey had finished writing the first column, then-Editorial Page Editor Neal approved it for publication. *Id.* at pp. 117-18.  The column was then submitted to Ryerson for final review.  Ryerson decided not to publish the column because he thought it was too "graphic" and "over-the-top" in its descriptions of the consequences of anal intercourse.  Ryerson Dep. at 34-35, 55; Neal Dep. at 25; Coffey Dep.

5

at 112, 117; Ryerson Decl., ¶ 5; Def.'s Ex. 18.  However, Ryerson informed Neal that he would consider running an edited, less-graphic version of the column that focused on the dangers of unprotected sex.  Ryerson Dep. at 55.

The next day, July 24, 2003, Ryerson received an email from a member of the Christian Student Foundation which expressed his disagreement with same-sex marriage.  Coffey Dep. at 141-43; Def.'s Ex. 19.  The student copied Coffey on the correspondence.  *Id.*  Ryerson, copying Coffey, responded to the student by stating, "Very good, and thoughtful questions!  May we consider your letter for publication?"  *Id.*  An hour later, Coffey responded to Ryerson by stating that, although she and Ryerson held "certain beliefs that are 180 degrees apart," she knew that they both were "seeking truth."  Coffey Dep. at 145-45; Def.'s Ex. 20.  Coffey further apologized to Ryerson for being "disrespectful in [her] spirit" to Ryerson and invited him to lunch.  Coffey Dep. at 162-63; Def.'s Ex. 20.

Ryerson responded to Coffey by thanking her,  explaining that he did not necessarily believe in "one truth" and that editorials express "opinion" rather than "truth," and agreeing to discuss the issue further over lunch.  Ryerson Dep. at 61; Coffey Dep. at 163-65; Def.'s Ex. 20.  Coffey then replied with a seven-paragraph, page-long email expressing her religious views and her claim to have been "knocked out  by the Holy Spirit."  Ryerson Dep. at 61-62.  Coffey Dep. at 168, 170; Def.'s Ex. 21.  She further indicated that if Ryerson's views of tolerance were correct he should "call the nut farm now to haul [her] away."  Coffey Dep. at 171-72; Def.'s Ex. 21.  Ryerson viewed the email as inappropriate proselytizing because he felt that Coffey was trying to "convert" him.  Ryerson Dep. at 61-62.  He sent a brief response to Coffey reminding her that it was inappropriate to proselytize in the workplace.  Ryerson Dep. at 62; Coffey Dep. at 173; Patterson Dep. at 61; Ryerson Decl., ¶ 6.

Coffey interpreted the response as angry and "vitriolic." Def.'s Ex. 21. However, she concedes that the wording of the last email was "very fair" and that Ryerson "ha[d] a right to be upset about what he construes as proselytizing." Coffey Dep. at 177.

In addition to this encounter with Ryerson, THE STAR raises concerns with Coffey's adherence to the overtime policy. Employees seeking to work overtime were required to receive advance approval to do so from his or her immediate supervisor. Zoibi Decl., ¶ 5 and Ex. B; Coffey Dep. at 105. Coffey frequently worked late on various tasks without seeking or receiving prior approval to do so. Neal Dep. at 17-18; Coffey Dep. at 77, 106-07; Swarens Decl., ¶ 5. Neal, and later Swarens, insisted that Coffey report all time worked and refrain from working overtime unless she received prior authorization to do so first; however, Coffey continued to work late without obtaining prior authorization. Henry Dep. at 47; Neal Dep. at 17-18; Swarens Decl., ¶ 5.

In August 2003, Coffey met with Ali Zoibi ("Zoibi"), Vice President of Human Resources, regarding overtime and her pension with the newspaper. Zoibi Decl., ¶ 6. During the meeting, Coffey reported that Russ Pulliam had been paying her thousands of dollars for her extra work for the Pulliam Fellowship and complained that her pension account did not reflect this extra compensation. Zoibi Decl., ¶ 6; Coffey Dep. at 61, 105-07. Zoibi agreed to review the matter but stressed the importance of complying with the overtime policy in the future. Zoibi Decl., ¶ 6; Coffey Dep. at 105-06. Despite Zoibi's directive, Coffey continued to work overtime without seeking prior approval to do so. Zoibi Decl., ¶ 7 and Ex. C.

Soon thereafter, on September 3, 2003, THE STAR agreed to pay Coffey an additional lump sum of $5,500.00 based on a calculation performed by its pension specialists. Zoibi Decl., ¶ 8 and Ex. D; Coffey Dep. at 204-05. Following this payment, Zoibi and Henry had a brief conversation

in which they agreed that Coffey needed to be supervised more closely to ensure that she followed the overtime policy more closely. Zoibi Decl., ¶ 9; Henry Dep. at 55, 60-61; Ryerson Dep. at 70. Zoibi also spoke with Ryerson regarding the need for increased supervision of Coffey. Zoibi Decl, ¶ 9; Ryerson Decl., ¶ 7.

Sometime during the early Fall of 2003, Ryerson decided to reorganize the staffing of the Pulliam Fellowship. Ryerson Dep. at 128; Ryerson Decl., ¶ 8; Coffey Dep. at 220-21. Because the Pulliam Fellows interned in the Newsroom, Ryerson believed that it made more sense to shift the responsibility for the Pulliam Fellowship from the Editorial Page Department to the Newsroom staff so that the Newsroom would be in a better position to decide which Fellows to recruit for full time positions. Ryerson Decl., ¶ 8; Coffey Dep. at 219. As a result of the reorganization, the Pulliam Fellowship ran more efficiently and required half of the administrative time that it did prior to the reorganization. Ryerson Decl., ¶ 8.

The reorganization of the Pulliam Fellowship meant that Coffey's administrative position was effectively eliminated, leaving her with only three days of work per week in the Editorial Page Department. Ryerson Dep. at 128-29; Ryerson Decl., ¶ 9. At that time, there was no available full-time position for an Editorial Writer; therefore, Ryerson offered Coffey an available full-time position as a Copy Editor at her same rate of pay and benefits. Ryerson Dep. at 129, 131-32, 159; Ryerson Decl., ¶¶ 9-10; Coffey Dep. at 217-19, 223-25; Def.'s Ex. 25, p. 16. Ryerson made the offer on Friday, October 10, 2003. *Id.* Ryerson believed that the Copy Editor position would be a good fit for Coffey because she had experience in that position, she claimed to have enjoyed it, and it would avoid the unauthorized overtime issue because the supervisor's desk would be adjacent to

Coffey's, thereby permitting closer supervision.  Ryerson Dep. at 130, 159; Ryerson Decl., ¶ 9;

Henry Dep. at 42, 51, 61-62; Coffey Dep. at 74-75; Def.'s Ex. 17, p. 15.

Coffey has voiced no complaints about Ryerson's decision to remove her from her

administrative assistant responsibilities; however, she rejected the full-time Copy Editor job and

asked if she could work two days per week as a Copy Editor and keep working three days per week

as an Editorial Writer.  Ryerson Dep. at 129-30; Coffey Dep. at 218-19, 236-37; Def.'s Ex. 25, p.

16.  Coffey also offered to work in other departments.  Coffey Aff., ¶¶ 23-24; Pls.' Ex. 10, p. 2.

Ryerson declined Coffey's proposal to work part time as a Copy Editor because he did not want an

employee splitting time between the Newsroom and Editorial Page Department.  Ryerson Dep. at

129-30; Ryerson Decl., ¶ 10.  The following Monday, October 13, 2003, Coffey submitted her letter

of resignation.  Coffey Dep. at 250; Def.'s Ex. 26.  She also sent an unsolicited email to Henry in

which she thanked Henry for the privilege of working at THE STAR and expressed how much she

"enjoyed and appreciated it."  Coffey Dep. at 266; Def.'s Ex. 27.

Following her resignation, Coffey did not experience any "significant emotional harm," was

not depressed, and did not consult a doctor for physical or emotional issues resulting from her

employment at THE STAR.  Coffey Dep. at 34-41.  She did not file a charge of discrimination against

THE STAR until almost ten months had elapsed and after she had been terminated by her subsequent

Christian employer.  *Id.* at 308, 344-49, 355; Def.'s Ex. 28.

## C.  PATTERSON'S EMPLOYMENT HISTORY AND TERMINATION

Patterson began working as an Editorial Writer in 1995.  Patterson Dep. at 41-42.  The stated

goal as a writer for all editorials and columns was to be completely accurate.  *Id.* at 59-60.  Further,

Patterson understood that he was responsible for the research and facts contained in the writings that he submitted.  *Id.* at 54-55.

For a number of years, Patterson's supervisors noted problems with his writing abilities and work performance.  Neal Dep. at 38, 108-09; Swarens Decl., ¶ 4.  Neal testified at her deposition that Patterson required more editing than any other Editorial Writer that she supervised.  Neal Dep. at 38, 108.  She also indicated that Patterson's major weakness was his inability to organize his pieces effectively.  *Id.* at 109.  Finally, she noted that Patterson occasionally failed to complete the research necessary for his editorials and columns.  *Id.* at 108-09.  Neal stated that the shortcoming with Patterson's research caused her to direct Patterson to go back and add additional sources.  *Id.*

The concerns with Patterson's work were reflected in his performance appraisals.  Patterson Dep. at 95-97, 99-103; Def.'s Exs. 31, 32.  For example, Neal noted in Patterson's 2001-2002 evaluation that Patterson should strive for "less rewriting by editor" and "focus on writing quality, in particular organization and transition."  Patterson dep. at 95-97; Def.'s Ex. 30.  In Patterson's 2002-2003 evaluation, Neal noted that Patterson needed to achieve "consistency" in his writing and rely less on clichés.  Patterson Dep. at 99-103; Def.'s Ex. 31.  An outside writing consultant who evaluated Patterson's work echoed these same observations.  Patterson Dep. at 88-94.

In March 2003, Patterson submitted an editorial asking readers to pray for our troops in Iraq. *Id.* at 85; Neal Dep. at 68-69; Def.'s Ex. 29.  Neal, Patterson's supervisor at the time, revised the editorial, added a prayer at the end, and submitted it for publication.  Neal Dep. at 68-69.  The editorial ran on March 20, 2003.  Patterson Dep. at 85; Neal Dep. at 68; Def.'s Ex. 29.  Ryerson, who had just started at THE STAR, advised Neal that he felt uncomfortable with an editorial directing readers how to engage in religious practice such as prayer.  Ryerson Dep. at 45-46; Ryerson Decl.,

10

¶ 11; Neal Dep. at 69, 90.[1]   Ryerson was not angry about the editorial.   Ryerson Decl., ¶ 11; Neal

Dep. at 69, 90.   In fact, Neal interpreted Ryerson's comments as simply stating his preferences as

the editor to protect the newspaper's credibility.   Neal Dep. at 90; Ryerson Decl., ¶¶ 2, 12.

Thereafter, in August 2003, Swarens took over as the Editorial Page Manager while Neal was

on sabbatical.   When he replaced Neal, he was surprised at the number of errors in Patterron's

writing, which he perceived as more prevalent in Patterron's drafts than any other Editorial Writer.

Swarens Decl., ¶¶ 10, 13.   Several of the errors were factual errors.   Patterson Dep. at 60-62;

Swarens Decl., ¶¶ 10, 13; Def.'s Exs. 33, 35, 36, 37.   Although Swarens mentioned many of these

errors to Patterson, Patterson's accuracy did not improve.   Patterson Dep. at 175-76, 206; Swarens

Decl., ¶ 14; Def.'s Ex. 39.

On December 1, 2003, Patterson applied for the resulting vacancy in the Assistant Editorial

Page Editor position.   Patterson Dep. at 124-27; Def.'s Ex. 32.   Patterson contends that he was well-

qualified for the position based on his experience, reputation, and a favorable performance

evaluation in January 2003.[2]   Patterson Aff., ¶ 4; Pls.' Ex. 16.   Swarens did not believe that Patterson

---

[1]   Incidentally, this was not the first time that management disagreed with Patterson on what was appropriate to publish.   For example, Patterson devoted time to focusing columns on the Oklahoma City bombing conspiracy.   Neal Dep. at 36, 50; Swarens Decl., ¶ 9.   Henry believed that the focus was inappropriate because it did not deal with local news, and Neal and Swarens both tried to dissuade Patterson from writing about the bombings so frequently.   Neal Dep. at 36, 50; Swarens Decl., ¶ 9.   However, Patterson continued to try to write about the issue. Neal Dep. at 36, 50; Swarens Decl., ¶ 9.

[2]   The performance appraisal for the period ending January 2003 was completed by Neal and revealed an overall performance assessment as a "3" on a "1-5" scale, which means that Patterson was meeting the objectives of the job and exceeding expectations in some areas. However, it also indicated that while Patterson's writing had improved, he still needed to develop "clearer, stronger more forceful writing" and a "strong voice for local political/neighborhood commentary."

should be interviewed for the position based upon Patterson's past writing issues, Patterson's continued practice of writing columns about national instead of local issues, and Patterson's lack of management experience. Swarens Decl., ¶ 11. Swarens communicated this information to Ryerson who agreed that there was no need to interview Patterson. *Id.*; Ryerson Decl., ¶ 12. However, THE STAR did interview a younger African-American who had no previous managerial or editorial writing experience. Pls.' Ex. 17. However, Ryerson and Swarens ultimately decided not to fill the vacant position at all. Ryerson Decl., ¶ 13; Swarens Decl., ¶ 12; Patterson Dep. at 127. Instead, in June 2004 they hired the young individual whom they had interviewed for the vacancy as another Editorial Writer because of the need for an additional Editorial Writer. Ryerson Dep. at 134-35; Ryerson Decl., ¶¶ 12-13; Swarens Decl., ¶¶ 11-12.

Thereafter, Swarens believed that Patterson's performance continued to decline. Swarens Decl., ¶ 14. On May 21, 2004, THE STAR published an editorial submitted by Patterson that criticized the Humane Society of Indianapolis for not disclosing sufficient information about its finances. Patterson Dep. at 137; Swarens Decl., ¶ 14; Def.'s Ex. 38. After the editorial was published, Swarens learned that the Humane Society had released its annual report providing extensive detail about its contributions and expenses. Patterson Dep. at 137-40, 145; Swarens Decl., ¶ 14. This mistake required the newspaper to publish a correction. Swarens Decl., ¶ 14; Def.'s Ex. 38. When questioned about the error, Patterson would not take responsibility for it. Swarens Decl., ¶ 14. Although Patterson admitted that it was his job to check the facts contained in his editorials and columns, he insisted that the reporter who covered the Humane Society meeting was primarily responsible for the error. Patterson Dep. at 139-40, 142, 145.

Because of Patteron's performance issues and refusal to accept responsibility for what Swarens perceived were serious errors, Swarens recommended that Patterson be placed on a Performance Improvement Plan ("PIP"). Henry Dep. at 101; Swarens Decl., ¶ 15. PIP's were issued in phases at the newspaper, staring with a written warning, progressing to a final written warning, and eventually resulting in termination if necessary. Zoibi Decl., ¶ 10 and Ex. E. While suspension was an optional step on the discipline continuum, it was one that was rarely employed. *Id.* Ryerson and Human Resources deferred to Swarens's recommendation. Swarens Decl., ¶ 15; Ryerson Dep. at 41, 126. Consequently, on July 12, 2004, Swarens met with Patterson and informed Patterson that he was being placed on the written warning phase of a PIP. Patterson Dep. at 166-67; Swarens Decl., ¶ 15; Def.'s Ex. 39.

According to Swarens, Patterson's performance issues persisted. Swarens Decl., ¶ 16. For example, Swarens noted that within months of receiving the PIP, Patterson submitted two editorials with factual errors that once again required the newspaper to publish corrections. *Id.*; Patterson Dep. at 63-64; Def.'s Exs. 45-48. Nonetheless, because Swarens believed that Patterson's performance had improved somewhat, he recommended keeping Patterson at the written warning level. Swarens Decl., ¶ 16; Patterson Dep. at 177; Def.'s Ex. 46. Ryerson and Human Resources once again deferred to Swarens's recommendation. Swarens Decl., ¶ 16; Ryerson Decl., ¶ 14. Therefore, on November 10, 2004, Swarens informed Patterson that the written warning period for the PIP was being extended. Swarens Decl., ¶ 16; Def.'s Ex. 46.

Subsequently, Patterson experienced additional issues with his writing. Specifically, he submitted a piece that incorrectly reported the amount that residents' property taxes would increase if a new bond were approved. Swarens Decl., ¶ 17; Patterson Dep. at 182; Def.'s Ex. 47. Once

again, THE STAR had to run a correction.  Swarens Decl., ¶ 17; Patterson Dep. at 181; Def.'s Ex. 48.

Swarens was further concerned by an editorial that Patterson had written endorsing AirTran's bid

for ATA Airlines.  Swarens Decl., ¶ 18; Patterson Dep. at 182-83; Def.'s Ex. 49.  In writing the

editorial, Patterson had contacted AirTran but never bothered to speak with any representatives from

Southwest Airlines, which had placed a competing bid for ATA.  Swarens Decl., ¶ 18; Patterson

Dep. at 184, 187-88.  The result was an editorial with several errors that led to dozens of complaints

from readers and required Ryerson and Swarens to meet with Southwest's CEO and other

representatives to apologize for some of the errors.  Ryerson Decl., ¶ 15; Swarens Decl., ¶ 18.

When confronted about the errors, Patterson insisted that the blame lay with the editorial

board, which had decided to support AirTran's bid without the benefit of interviewing sources from

the various airlines.  Swarens Decl., ¶ 18; Patterson Dep. at 184, 187.  He saw no issue with his

failure to contact Southwest.  Patterson Dep. at 184.  As a result, and with Ryerson's and Human

Resource's approval, Swarens escalated Patterson to the final written warning status on December

23, 2004.  Swarens Decl., ¶ 19; Patterson Dep. at 188-89; Def.'s Ex. 50.

Following notice of a final written warning, Patterson submitted drafts with various errors,

including misspelled names and incorrect dates.  Swarens Decl., ¶ 20; Patterson Dep. at 64; Def.'s

Exs. 51-53.  Based on these final errors, Swarens recommended that Patterson's employment be

terminated.  Swarens Decl., ¶ 21; Ryerson Decl., ¶ 16.  Based upon the feedback provided by

Swarens, Ryerson and Human Resources accepted Swarens's recommendation. Swarens Decl., ¶ 21;

Ryerson Decl., ¶ 16.  On May 3, 2005, Swarens informed Patterson of the termination decision.[3]

Swarens Decl., ¶ 21; Patterson Dep. at 204-05; Def.'s Ex. 55.

Patterson suggests that his PIP's had nothing to do with his performance but instead were designed to build a case against him.  He contends that an allegedly increased workload under Swarens led to more errors in his work; however, his personnel records suggest that he had been meeting a similar workload under Neal.  Patterson Dep. at 134-35, 259; Neal Dep. at 134-35; Def.'s Exs. 31-32.  Patterson also asserts that he was singled out for different treatment by being required to obtain pre-approval for his columns.  Patterson's assertion is based on the fact that no other writers told him that they had to submit summaries for their work.  Patterson Dep. at 245-45.  However, Swarens's standard practice was to speak with each column writer about their weekly ideas before the writer began researching and writing.  Swarens Decl., ¶ 23.  Finally, Patterson argues that errors were a daily occurrence and that other employees with high errors rates were not placed on PIP's but were even given coaching to improve.  Ryerson Dep. at 114-15;  Holladay Aff., ¶ 4 and Ex. 1; Patterson Aff., ¶¶ 26-28; Pls.' Ex. 21.

Like Coffey, Patterson has never sought medical treatment of any kind as a result fo his employment with and termination from THE STAR.  Patterson Dep. at 275-77.  However, he does claim that he experienced several ailments like heart palpitations, increased blood pressure, and insomnia due to increased stress while working under Swarens and after he was terminated.  Patterson Aff., ¶¶ 19-20.

---

[3]  Swarens's Declaration indicates a termination date of May 3, 2007.  However, the termination notice is actually dated May 3, 2005, and the Court notes that the Complaint was filed in 2005.  Therefore, the Court concludes that the date is incorrect in Swarens's Declaration.

### D.  PLAINTIFFS' BELIEFS AND THE DEMOGRAPHICS AT THE STAR

Plaintiffs both claim to be Christians and both believe that homosexuality is a sin.  Coffey Dep. at 39, 53-54; Patterson Dep. at 220-21; Compl.  Ryerson does not share the same opposition to homosexuality and same-sex marriage, and he supports homosexual rights.  Ryerson Dep. at 24. Indeed, Plaintiffs allege that news coverage of homosexual issues has increased since Henry and Ryerson began working at THE STAR, with the majority of the coverage favoring homosexuality. Pls.' Ex. 5.  Plaintiffs believe that Henry and Ryerson conspired to force them out of THE STAR because of a disagreement with Plaintiffs' views on homosexuality.  Coffey Dep. at 39-41; Patterson Dep. at 219, 234-35.

Although Plaintiffs insist that THE STAR has attempted to purge Christians from its workforce, other individuals who claim to be or are believed to be Christians remain employed. Ryerson Dep. at 20-22; Coffey Dep. at 50, 86-87; Patterson Dep. at 320; Swarens Decl., ¶ 26. Indeed, Swarens, like Patterson and Coffey, believes that homosexual practice is incompatible with Biblical and Christian teachings.  Swarens Decl., ¶ 25.  Similarly, Henry, a professed Christian, opposes same-sex marriage, which is the same editorial position held by THE STAR on the subject. Henry Dep. at 153-54; Ryerson Dep. at 33.  In addition, although Patterson feels that his race and age played a role in his termination, THE STAR claims to be an equal opportunity employer with policies prohibiting unlawful discrimination.  Zoibi Decl., ¶ 4.  In fact, THE STAR hired another African-American for the Editorial Page Department before Patterson was terminated and it continued to employ other middle-aged individuals after Patterson was terminated.   *Id.*, ¶ 11; Ryerson Decl., ¶ 11; Swarens Decl., ¶¶ 12, 21.

16

### III. SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), *reh'g denied*. Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## IV.  DISCUSSION[4]

### A.  DISCRIMINATION CLAIMS

The Plaintiffs present no direct evidence of discrimination and instead rely on the burden-shifting mechanism outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), to prove their claims of discrimination.  Under the indirect method of proof, the Plaintiffs

---

[4] Although the Plaintiffs raise separate claims of employment discrimination under federal, state, and local law, the Court only needs to address the claims once.  This is because Indiana looks to federal law for interpreting the parallel state provisions and local law provides, with certain limited exceptions that no one has indicated apply here, the same rights and protections as state law.  *See Ind. Civil Rights Comm'n v. S. Ind. Gas & Elec. Co.*, 648 N.E.2d 674, 680-81 (Ind. Ct. App. 1995), *trans. denied*; Indianapolis/Marion Co., Ind., Rev. Code of the Consol. City & County § 581-103.

must initially set forth, by a preponderance of the evidence, a *prima facie* case of race discrimination. *Id.* If they make a showing sufficient to prove a *prima facie* case, the Plaintiffs will enjoy a rebuttable presumption of discrimination that shifts the burden of production to THE STAR to articulate a "legitimate, nondiscriminatory reason" for its actions. *See Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 379 (7th Cir. 2000). THE STAR may do so by producing evidence, whether or not persuasive, of a nondiscriminatory reason. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (noting that the plaintiff retains the ultimate burden of persuasion on the issue of intentional discrimination). If THE STAR succeeds in this task, the presumption dissolves and the burden of production shifts back to the Plaintiffs to demonstrate that the proffered reason for the adverse employment action is a pretext for discrimination or retaliation. *See id.* at 507-08; *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1309 (7th Cir. 1997).

In this case, Coffey alleges that THE STAR discriminated against her on the basis of her religion by transferring her to the position of Copy Editor. Patterson contends that he was discriminated on the basis of his religion, age, and race by not being promoted to the Assistant Editorial Page Editor position, being placed on PIP's, and being terminated. To establish a *prima facie* case based on their claims of disparate treatment, each Plaintiff must show that: (1) they belong to a protected class; (2) they performed their job according to THE STAR's legitimate expectations; (3) they suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *See Ajayi v. Aramark Bus. Serv., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003); *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001).[5]

_____

[5] The formula for the *prima facie* case is slightly modified for failure to promote claims. To establish a *prima facie* case on his claim that he was denied a promotion to the Assistant Editorial Page Editor position, Patterson must show: (1) that he was a member of a protected

19

If the Plaintiffs, could show a *prima facie* case and THE STAR succeeded in articulating a "legitimate, nondiscriminatory reason" for their actions, the Plaintiffs could still prevail by demonstrating pretext. *See St. Mary's Honor Ctr.*, 509 U.S. at 507-08. Pretext means more than a mistake on the part of the employer; it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). In other words, a plaintiff bears the burden of showing that the employer's reason for the adverse employment action was a lie or had no basis in fact. *See Crim v. Bd. of Ed. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 541 (7th Cir. 1998). In order to show pretext, a plaintiff must present evidence showing that a defendant's proffered reason was: (1) factually baseless; (2) not the actual motivation for the adverse employment action; or (3) was insufficient to motivate the adverse employment action. *See Nawrot v. CPC, Int'l.*, 277 F.3d 896, 906 (7th Cir. 2002) (citation omitted). These formulations are simply different ways of recognizing that when the sincerity of an employer's asserted reasons for discharging an employee are cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation. *See Testerman v. EDS Tech. Prod. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) (citation omitted). "If the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses." *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995). In such circumstances, the employee creates "a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination." *Dey v. Cold Const. & Devel. Co*, 28 F.3d 1446, 1461 (7th Cir. 1994).

---

class; (2) that he applied for and was qualified for the position he sought; (3) that he was rejected for the position; and (4) that the person promoted had similar or lesser qualifications for the job. *See Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003); *Ghosh v. Ind. Dep't. of Envt'l Mgmt.*, 192 F.3d 1087, 1090-91 (7th Cir. 1999).

The Court concludes that an analysis of whether the Plaintiffs were meeting THE STAR's legitimate expectations and whether the reasons for the allegedly adverse actions were pretexts is dispositive. While normally the Court would first determine whether the Plaintiffs had established a *prima facie* case before engaging in a pretext inquiry, in this case the questions boil down to the same thing: whether THE STAR is lying. Because the two questions merge, the Court finds it easier to run through the analysis only once, while keeping in mind that if the Plaintiffs cannot present sufficient evidence of pretext they also cannot show that they were meeting THE STAR's expectations. *See, e.g.*, *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 822-23 (7th Cir. 2006).

Here, the Plaintiffs have not presented evidence showing that THE STAR's proffered reasons for the employment actions were factually baseless or insufficient to motivate THE STAR to take the actions that it did. It is undisputed that Coffey regularly worked overtime without seeking pre-approval and that she had been instructed to comply with the overtime policy. Further, the reason for moving her to a full-time Copy Editor position was to provide her with five days of work per week and to place her in a position where her hours could be more closely supervised. Thus, there was a factual basis for the transfer and there is no admissible evidence suggesting that this employment decision would be insufficient to motivate an employer to take the action that it did.

Similarly, the evidence reveals that Patterson had a history of writing issues ranging from factual errors to organizational problems and that he had been counseled on the need to improve in those areas. Moreover, the perception of his supervisors was that he had more errors than other Editorial Writers. These are the stated concerns underlying the decision not to interview Patterson

for the Assistant Editorial Page Editor position.[6]  Likewise, these concerns, along with Patteron's perceived attempt to cast blame for his factual errors on others, formed the basis of Swarens's decision to place Patterson on the initial PIP.  Like Coffey's claim, there is no admissible evidence indicating that the proffered reasons for the employment actions were factually baseless or insufficient to motivate THE STAR to pursue the course of action that it did.

Finally, the Plaintiffs have not demonstrated a genuine issue of material fact that the proffered reasons were not the actual motivation for the adverse employment action and that THE STAR was really motivated by an improper factor like religion, race, or age.  In fact, the undisputed evidence reveals that the Plaintiffs' supervisor, Swarens, held similar religious view on sexuality and that he made the recommendations to place Patterson on a PIP and, ultimately, to terminate Patterson's employment.  Moreover, with respect to the claims of age and race discrimination, the evidence reveals that THE STAR continued to employ other middle-aged individuals and African-Americans after Patterson was terminated.  These circumstances further militate against a finding that THE STAR was motivated by an improper factor.  Finally, Patterson's suggestion that animus against him can be demonstrated by the fact that other employees received individual coaching loses its force in light of the fact that Patterson had also received coaching on his writing from an outside consultant who, incidentally, echoed many of the same concerns with Patterson's writing that Patteron's supervisors did.

_____

[6]  It is also undisputed that no one was hired for the position, rendering it exceedingly difficult, in light of the stated standards,  for Patterson to even prove a *prima facie* case on his claim that he was denied a promotion.  *See See Grayson*, 317 F.3d at 748 (providing *inter alia* that a plaintiff must show that person promoted had similar or lesser qualifications for the job).

In light of the foregoing, the Court **GRANTS** THE STAR's motion for summary judgment on the discrimination claims and **DISMISSES those claims with prejudice**.

## B.  PATTERSON'S RETALIATION CLAIM

Patterson contends that THE STAR retaliated against him for filing a charge of discrimination with the EEOC by placing him on a final written warning and later terminating him.  Patterson's memorandum in opposition to the motion for summary judgment relies on the indirect method of proving a retaliation claim.  Under the indirect method, Patterson  must establish a *prima facie* case of retaliation by showing that: (1) he engaged in a statutorily protected activity; (2) he was meeting THE STAR's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *See Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903-04 (7th Cir. 2005) (internal citation omitted).  If Patterson can establish a *prima facie* case, the burden shifts to THE STAR to present evidence of a non-discriminatory reason for its employment action.  *See id.*  Finally, if THE STAR meets that burden, the burden shifts back to Patterson to demonstrate that the stated reason is pretextual.  *Id.*

Here, there is no dispute regarding the first and third prongs needed to establish a *prima facie* case.  The Court concludes that whether Patterson can satisfy the fourth prong is debatable.  THE STAR argues that Patterson cannot because both Neal and Swarens, Patterson's supervisors, agree that Patterson needed more editing than other Editorial Writers and that Patterson had more egregious errors.  Neal Dep. at 38, 108-09; Swarens Decl., ¶¶ 13, 16-18.  In contrast, Patterson contends that his overall error rate was actually lower than other employees and that similarly-

23

situated employees received personal mentoring rather than being placed on PIP's or terminated. Ryerson Dep. at 114-15; Holladay Aff., ¶ 4 and Ex. 1; Patterson Aff., ¶¶ 26-28; Pls.' Ex. 21. Because the evidence is disputed, and because on summary judgment the Court is required to view the evidence in a light favorable to Patterson, the Court finds that Patterson has raised a genuine issue about whether he has met the fourth prong of the test.   Accordingly, for the purposes of summary judgment, the Court concludes that he has met the fourth prong.

Thus, the only remaining question for determining a *prima facie* case of retaliation is the second prong, *i.e.*, was Patterson meeting THE STAR's legitimate expectations.  Patterson argues that he was meeting those expectations because Swarens assigned him a heavier workload than other writers.  Although Patterson insists that he was subjected to an increased workload, his personnel records suggest that he had been meeting a similar workload under Neal.  Patterson Dep. at 134-35, 259; Neal Dep. at 134-35; Def.'s Exs. 31-32.  Moreover, the evidence reveals that Patterson had been having trouble with his writing for a number of years and that his writing.   Specifically, his supervisors expressed that Patterson required more editing than other writers, that Patterson's pieces were not always organized effectively and sometimes required the addition of more sources, that Patterson needed to focus more on local rather than national stories, and that several of his errors required THE STAR to run corrections.   Neal Dep. at 38, 108-09, Swarens Decl., ¶¶ 4, 10, 13-20; Patterson Dep. at 60-64, 95-97, 99-103, 137-40, 145, 175-77, 181-84, 187-88, 206; Def.'s Exs. 30-30, 47-48, 51-53.  An outside consultant even echoed some of these concerns.  Patterson Dep. at 88-94.  These circumstances overwhelmingly demonstrate that Patterson was not meeting THE STAR's legitimate expectations.

Even if Patterson could demonstrate a *prima facie* case of retaliation, he fails to shw that THE STAR's actions were retaliatory. Patterson was placed on a PIP before he even filed a charge with the EEOC. Def.'s Exs. 42-43. Moreover, Patterson was not terminated until nearly nine months after he filed and his charge and after the charge had been dismissed by the EEOC. Def.'s Exs. 40-41, 55. Finally, Patterson has not presented sufficient evidence to raise a genuine question that THE STAR's stated reasons for terminating his employment were pretextual and inappropriate or illegitimate.

Based on the foregoing, the Court **GRANTS** THE STAR's motion for summary judgment on the retaliation claim and **DISMISSES the claim with prejudice**.

## C. COFFEY'S CONSTRUCTIVE DISCHARGE CLAIM

Although Coffey resigned her employment, she claims that she was constructively discharged. The term "constructive discharge" refers to a situation where an employee quits under circumstances where the working conditions made remaining with the employer intolerable. *See Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998). Establishing constructive discharge is a two-step process. *See Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir. 1999). First, Coffey must show that her working conditions were so intolerable that a reasonable person would have been compelled to resign. *See Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996). Second, the conditions must be intolerable because of unlawful discrimination. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998). Working conditions for constructive discharge must be even more egregious than the high standard for a claim of hostile work environment because "in the 'ordinary' case, an employee is expected to remain employed

while seeking redress." *Wieland v. Dep't of Transp.*, 98 F. Supp. 2d 1010, 1025 (N.D. Ind. 2000) (citing *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044 (7th Cir. 2000), *cert. denied*, 531 U.S. 1078 (2001)).[7]

Coffey claims that Ryerson's decision to transfer her to Copy Editor full time was really a demotion, even though she was able to maintain the same pay and benefits. She believes that the decision was motivated by a pro-homosexual and anti-traditional Christian attitude. She also relies on two events that preceded her transfer, Ryerson's decision not to publish her column about anal intercourse and her email exchange with Ryerson where he advised her not proselytize on the job. Coffey contends that, under the circumstances, her only choice was to quit her job.

The Court concludes that Coffey has failed to present a genuine issue of material fact showing that THE STAR is not entitled to summary judgment on the constructive discharge claim. First, there is no evidence that the two noted circumstances were motivated by Coffey's religion. Coffey admits that she did not write the column from a religious perspective, and Ryerson's stated reason for not publishing the column had nothing to do with religion; he simply thought that it was too graphic as written, but he indicated that would consider publishing an edited, less-graphic version that focused on the dangers of unprotected sex. Ryerson Dep. at 34-35, 55; Neal Dep. at 25; Coffey Dep. at 112, 117, 293; Ryerson Decl., ¶ 5; Def.'s Ex. 18. With respect to the email exchange

---

[7] There is another method of proving constructive discharge, that of proving that discharge is imminent. *See, e.g.*, *E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). However, the parties have not made an imminent-discharge argument. Further, the circumstances do not suggest that Coffey was faced with the type of environment that would lend itself to such an argument. *See id.* at 332-333. Therefore, the Court will not consider this line of argument on Coffey's constructive discharge claim.

26

with Ryerson, Coffey herself agrees that Ryerson's concerns were "very fair" and that Ryerson "ha[d] a right to be upset about what he construe[d] as proselytizing."  Coffey Dep. at 177.

Moreover, there are no allegations that Coffey was subjected to disparaging remarks about her religion, and there is no evidence to indicate that the decision to transfer Coffey was motivated by her religion.  Instead, the stated reason for moving Coffey to the Copy Editor position is neutral on the subject of religion.  Specifically, Ryerson believed that Coffey could be more closely supervised and avoid violations of the overtime policy.  Ryerson Dep. at 130; Ryseron Decl., ¶ 9.

Finally, Coffey's claim of constructive discharge is undermined by the fact that she sent a pleasant email to Henry on her last day thanking Henry for the opportunity of working at the newspaper.  Coffey Dep. at 266; Def.'s Ex. 27.  There is no suggestion in the email that Coffey had been harassed because of her religion, and so the email contradicts her notion that the workplace was intolerable.  *See Wolf v. Nw. Ind. Symphony Soc'y*, 250 F.3d 1136, 1143 (7th Cir. 2001), *reh'g and reh'g en banc denied.  See also Vredevelt v. GEO Group, Inc.*, 145 F. App'x 122, 133 (6th Cir. 2005) (unpublished decision).

Taken together, the foregoing circumstances do not suggest that Coffey was faced with the type of anti-religious environment that would have compelled a reasonable employee to resign. Therefore, her constructive discharge claim must fail.  Accordingly, the Court **GRANTS** THE STAR's motion for summary judgment on this claim and **DISMISSES the claim with prejudice**.

### D.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIMS

Although Plaintiffs both make a claim for negligent infliction of emotional distress, it is clear that those claims fail as a matter of law.  To prevail on a claim for negligent infliction of emotional

27

distress under Indiana law, a plaintiff must satisfy the modified impact rule. *See Atlantic Coast Airlines v. Cook*, 857 N.E.2d 989, 996-97 (Ind. 2006); *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1263 (Ind. Ct. App. 2002).[8]  Under that rule, a plaintiff must demonstrate a direct impact, which is defined as a physical impact.  *See Powdertech*, 776 N.E.2d at 1263.  Termination of employment is insufficient to satisfy the impact requirement.  *See id.*

Here, Plaintiffs have presented no evidence of any physical impact necessary to establish a negligent infliction of emotional distress claim.  Therefore, they cannot sustain such a claim.  Accordingly, the Court **GRANTS** THE STAR's motion for summary judgment on these claims and **DISMISSES the claims with prejudice**.

---

[8]  There is an exception to this general rule for bystanders who actually witnesses a loved one become injured or comes on the scene shortly after the injury.  *See Atlantic Coast Airlines*, 857 N.E.2d at 997-98.  That exception is not applicable here.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Defendants', Indiana Newspapers, Inc., an Indiana corporation, publisher of *The Indianapolis Star*, owned by Gannett Co., Inc., a foreign corporation, motion for summary judgment (Docket No. 90) is **GRANTED**.  Plaintiffs', James Patterson and Lisa M. Coffey, claims are **DISMISSED with prejudice**.

IT IS SO ORDERED this 27th day of March, 2008.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

**Electronically distributed to:**

Lawrence Todd Newman
LAWRENCE LAW FIRM
lawrencelawfirm@sbcglobal.net

Stephanie A.H. Blackman
BARNES & THORNBURG LLP
stephanie.blackman@btlaw.com

Kenneth J. Yerkes
BARNES & THORNBURG LLP
ken.yerkes@btlaw.com

29